MICHAEL W. YOUNG, USB #12282
LAUREN M. HUNT, USB #14682
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
MYoung@parsonsbehle.com
LHunt@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| MARISSA ROOT, <br><br> Plaintiff, <br><br> vs. <br><br> UNIVERSITY OF UTAH, UTAH VALLEY UNIVERSITY, and UTAH SYSTEM OF HIGHER EDUCATION <br><br> Defendants. | **COMPLAINT AND JURY DEMAND** <br><br> Case No. 2:21-cv-00744-DBB <br><br> Judge David Barlow |

COMES NOW the Plaintiff Marissa Root, (hereinafter "Plaintiff"), complains of Defendants University of Utah, Utah Valley University, and the Utah System of Higher Education, demands trial by jury and as and for causes of action alleged as follows:

## SUMMARY OF CASE

Plaintiff was a sophomore student at Utah Valley University when she was raped by a football player/student at the University of Utah. Desperate and distraught, she reached out to the Title IX office at her own school, hoping to get access to supportive measures. Concerned that

the football player could continue to victimize other women, she reached out to the Title IX office at the University of Utah, to make the school aware of the situation so it could initiate an investigation into her assailant. Both schools' Title IX offices sent her away, claiming that because the victim and perpetrator attended different schools, they had no obligation to assist her whatsoever, or investigate a student credibly accused of rape. Both schools, however, are member schools of the Utah System of Higher Education, the Board of which is the recipient of federal funds under Title IX. Member schools of the Utah System of Higher Education enjoy many benefits for their students, including easier transfer of credits, coordination relative to tuition, and oversight by the Board on issues like campus safety. Despite a clear ability to coordinate efforts on a Title IX investigation, and despite the Board having Title IX obligations as a federal funding recipient, students, including Plaintiff, are being unjustifiably and illegally ignored.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is and at all times was a resident of the State of Utah.

2.      University of Utah (**"U of U"**) is a public institution of higher education located in Salt Lake City, Utah.  At all relevant times, the U of U received Federal financial assistance and was therefore subject to the requirements of Title IX of the Education Amendments of 1971, 20 U.S.C. § 1681 et seq. (**"Title IX"**). At all relevant times, the U of U was a member of the Utah System of Higher Education.

3.      Utah Valley University ("**UVU**") is a public institution of higher education located in Orem, Utah.  At all relevant times, UVU received Federal financial assistance and was

2

therefore subject to the requirements of Title IX. At all relevant times, UVU was a member of the Utah System of Higher Education.

4.      The Utah System of Higher Education ("**USHE**") is comprised of Utah's eight public colleges and universities and eight technical colleges, including the U of U and UVU.

5.      Utah Board of Higher Education (the "**Board**") is a state governmental entity located in Utah that governs the Utah System of Higher Education. Utah's legislature has given the Board power to control, manage, and supervise USHE, which includes setting policy, reviewing programs and degrees, approving institutional missions, and submitting a unified education budget request to the governor.[1] The USHE Board "is the designated state educational agency authorized to negotiate and contract with the federal government and to accept financial or other assistance from the federal government or any of its agencies in the name of and in behalf of the state of Utah, under terms and conditions as may be prescribed by congressional enactment designed to further higher education."[2]

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims against the Defendants under Title IX and § 1983.

7.      This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391 because all defendants are residents of the State of Utah and the events or omissions giving rise to Plaintiff's claims occurred in the State of Utah.

---

[1] https://ushe.edu/board/about-the-board/
[2] U.C.A. §53B-7-103

4838-8532-0684.v1

## GENERAL ALLEGATIONS

**Risk of Sexual Violence for Women**

8.      Women are at a far greater risk of becoming victims of sexual violence than men. The following statistics compiled by the National Sexual Violence Resource Center paint an alarming picture for the United States:

9.      One in five women will be raped at some point in their lives. Comparatively, only one in seventy-one men will be raped.[3]

10.      Fifty-one percent of female victims of rape are raped by an intimate partner and forty-one percent of victims report being raped by an acquaintance.[4]

11.      Ninety-one percent of rape victims are women.[5]

12.      Compounding the problem, victims of sexual assault are at significantly higher risk of being assaulted again than those who have never been assaulted. Apart from domestic violence, sexual assault has the highest revictimization rate of any crime.[6]

---

[3] Black, M. C., Basile, K. C., Breiding, M. J., Smith, S .G., Walters, M. L., Merrick, M. T., Stevens, M. R., *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 summary report*, (2011). Retrieved from the Centers for Disease Control and Prevention, National Center for Injury Prevention and Control: http://www.cdc.gov/ViolencePrevention/pdf/NISVS_Report2010-a.pdf.

[4] *Id.*

[5] Rennison, C. M., *Rape and sexual assault: Reporting to police and medical attention*, 1992-2000 [NCJ 194530], (2002). Retrieved from the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics: https://www.bjs.gov/content/pub/pdf/rsarp00.pdf.

[6] Davis, R., Guthrie, P., Ross, T., O'Sullivan, C., *Reducing Sexual Revictimization: A Field Test with an Urban Sample* (2006). Retrieved from the National Criminal Justice Reference Service: https://www.ncjrs.gov/pdffiles1/nij/grants/216002.pdf.

4838-8532-0684.v1

**Title IX Offices**

13.     Title IX protects people from discrimination based on sex in education programs or activities that receive federal financial assistance.

14.     Title IX states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

15.     Title IX offices must offer supportive measures to every complainant as part of a recipient's response obligations under 34 CFR §106.44.

16.     With or without a grievance process that determines a respondent's responsibility, the final regulations in place require a recipient to offer supportive measures to a complainant, tailored to each complainant's unique circumstances[7], similar to the Department of Education's 2001 Guidance that directed a recipient to take timely, age-appropriate action, "tailored to the specific situation" with respect to providing "interim" measures to help a complainant. The current final regulations, however, clarify that supportive measures must be offered not only in an "interim" period during an investigation, but regardless of whether an investigation is pending or ever occurs.[8]

17.     The final regulations specify in § 106.44(a) that the Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures as defined in § 106.30, consider the complainant's wishes with respect to supportive measures, inform the

---

[7] §106.44(a) (requiring the recipient to offer supportive measures to a complainant, and requiring the Title IX Coordinator to discuss supportive measures with a complainant and consider the complainant's wishes regarding supportive measures); § 106.30 (defining "supportive measures" as "individualized services"))

[8] https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf.

4838-8532-0684.v1

complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint. Complainants will know about the possible supportive measures available to them and will have the opportunity to express what they would like in the form of supportive measures, and the Title IX Coordinator will take into account the complainant's wishes in determining which supportive measures to offer. The final regulations do prescribe that a recipient's Title IX Coordinator must remain responsible for coordinating the effective implementation of supportive measures, so that the burden of arranging and enforcing the supportive measures in a given circumstance remains on the recipient, not on any party.

18.    The Title IX Office is required to evaluate and, if necessary, investigate reports of sexual harassment or sexual violence, and then determine the appropriate response under the law.

**The Utah Board of Higher Education**

19.    As stated above, the Utah Board of Higher Education is "the agency authorized to negotiate and contract with the federal government and to accept financial or other assistance from the federal government or any of its agencies in the name of and in behalf of the state of Utah, under terms and conditions as may be prescribed by congressional enactment designed to further higher education."[9]

20.    Utah's System of Higher Education and the Board therefore constitute a recipient body of federal assistance, and therefore have obligations under Title IX for all students at its member schools.

---

[9] *Supra* note 2

4838-8532-0684.v1

21.     According to policies within the Utah System of Higher Education, "every student should have a safe environment in which to learn, study, and excel. If a student is confronted with violence, harassment, or discrimination, he or she should be treated appropriately in accordance with the law. To that end the Board of Higher Education and its institutions shall collaborate to comply with all state and federal laws pertaining to sexual misconduct, discrimination and harassment; to train and educate the faculty, staff and students about the law, policies, prevention strategies and resources addressing sexual misconduct and harassment; and to assess the climate of each campus and the system as a whole."[10]

22.     The Board of Higher Education shall provide opportunities for the institutions' Title IX officers to meet with each other and the Commissioner's staff—at least annually—to coordinate efforts, review changes to the law, identify best practices, review the institutions' policies and practices, and provide opportunities for consultation.[11]

23.     The Board of Higher Education shall provide training opportunities for Title IX officers and other individuals at the institutions who investigate alleged violations of the institutions' sexual misconduct, discrimination and harassment policies.  The training shall cover areas required by law and other best practices.[12]

24.     The Board of Higher Education shall provide annual training opportunities for individuals who conduct disciplinary proceedings, including hearing committees that address

---

[10] R262-1.
[11] R262-4.1.
[12] R262-4.2.

violations of the institutions' Title IX policies.  The training will cover areas required by law and other best practices.[13]

25.     The Board of Higher Education shall assist institutions to enter into memorandums of understanding with local law enforcement agencies—as allowed by applicable law—to share information, coordinate investigations, and otherwise collaborate to protect students' safety.[14]

26.     The Board of Higher Education shall assist the institutions to identify strategies for preventing sexual harassment, sexual violence, domestic violence, dating violence, and stalking, including outreach and educational activities for students, staff, and faculty. R262-4.5.

27.     The Board of Higher Education shall provide the institutions with other resources and opportunities to help institutions comply with sexual misconduct, discrimination, and harassment laws.[15]

28.     The Board of Higher Education shall identify and provide resources that institutions may use to develop campus safety training curricula.[16]

29.     The Board of Higher Education shall report annually to the Education Interim Committee and the Law Enforcement and Criminal Justice Interim Committee, at or before the committees' November meetings, system efforts to increase student safety under this policy, including each institution's campus safety plans.[17]

---

[13] R262-4.3.
[14] R262-4.4.
[15] R262-4.6.
[16] R262-4.7.
[17] R262-4.8.

4838-8532-0684.v1

30.     Institutions shall coordinate with each other and the Board of Higher Education to comply with sex discrimination and harassment laws by supporting activities of the Board of Higher Education described in R262-4.[18]

31.     The Board's policies allow for cross-college Title IX investigations, including access to student information across member schools.[19]

32.     Member schools within the Utah System of Higher Education enjoy coordination with each other, facilitated by the Board, for easier transfer of credits, tuition coordination, and relatively seamless access to other membership schools.[20]

33.     The Board may enact regulations governing the conduct of university and college students, faculty, and employees.[21]

34.     The Board thus has significant control over its member schools, including over matters dealing with sexual violence and student safety.

35.     The System of Higher Education and its Board constitute an "educational program" subject to Title IX. [22]

**Institutional Betrayal and the Exacerbation of Trauma**

36.     Emerging research shows that the way in which institutions respond to traumatic events experienced by individuals can profoundly affect such individuals. Where an institution betrays an individual's trust, e.g., by responding to a claim of sexual assault with harassment and

---

[18] R262-3.5.
[19] R210.1.
[20] https://ushe.edu/utah-transfer-guide/
[21] U.C.A. §53B-3-103(1).
[22] 34 CFR §106.2(h)(2)(i).

4838-8532-0684.v1

insensitive investigation practices, an individual will likely experience enhanced psychological distress.[23]

37.     Researchers have previously observed that interpersonal trauma perpetrated within a close relationship is more harmful than interpersonal trauma perpetrated by a stranger.[24] Accordingly, betrayal trauma is associated with higher rates of several outcomes including post-traumatic stress disorder, anxiety, depression, and borderline personality disorder.[25]

38.     When a victim reaches out to an institution for help in the wake of a traumatic experience, they place a great deal of trust with that institution.

39.     Institutional betrayal is a form of betrayal trauma that occurs where an institution has violated an individual's trust in a way that exacerbates the impact of a victim's traumatic experience.[26]

40.     As a form of betrayal trauma, institutional betrayal is also associated with a number of complex outcomes similar to those experienced by victims of interpersonal trauma. "When measured directly, the exacerbated effects of institutional betrayal on psychological well-being are clear and consistent with betrayal trauma theory: higher rates of disassociation (Figure [Below]), anxiety, sexual dysfunction, and other trauma related outcomes."[27]

---

[23] *See generally*, Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 American Psychologist 575 (September 2014).
[24] *Id.* at 577 (citing Freyd, J. J., *Betrayal Trauma: The Logic of Forgetting Childhood Abuse*, Cambridge, MA: Harvard University Press (1996)).
[25] *Id.* (citing Freyd, J. J., & Birrell, P. J.. *Blind to Betrayal,* New York, NY: Wiley (2013)).
[26] *Id.*
[27] *Id.* at 577-78.

4838-8532-0684.v1



**Title IX and Its Requirements**

41.     Title IX mandates that no person shall, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[28]

42.     The U.S. Department of Education Office for Civil Rights released "Dear Colleague" Letters applicable to this matter that provide guidance on how the mandate of Title IX might be accomplished by institutions and schools receiving federal funds.  The currently applicable letters were published in 2001 and 2008.

---

[28] 20 U.S.C. § 1681(a) (Sexual harassment, which includes unwanted sexual advances, rape, and/or sexual assault is prohibited by Title IX, *see supra.*)

**2001 Dear Colleague Letter**

43.     The 2001 Dear Colleague Letter emphasized from the outset the fundamental observation that "preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn."[29]

44.     The 2001 guidance also emphasized the fact that a school is obligated to act when sexual harassment or violence has occurred.  The school must take affirmative steps to "end the harassment, prevent its reoccurrence, [and] remedy its effects. If harassment has occurred, doing nothing is always the wrong response."[30]

45.     Title IX is broad in application and protects students whether the offending conduct occurred at facilities of the school, a class, a training location, or elsewhere.[31]

46.     Governmental regulations implementing Title IX prohibit, on the basis of sex, giving one student or a group of students preferential treatment in receiving aid or subjecting students to separate or different rules of behavior. This would include instances where a female student is punished differently than a male student for similar violations of a school's disciplinary codes or standards of behavior.[32]

47.     Additionally, a series of seemingly unrelated events or incidents at a school can—taken together—create a hostile environment. Assessment of the totality of the circumstances is critical in determining whether a hostile environment exists.[33]

---

[29] 2001 Dear Colleague Letter at ii.
[30] *Id.* at iii.
[31] *Id.* at 3.
[32] *See, e.g.*, *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).
[33] 2001 Dear Colleague Letter at 11.

4838-8532-0684.v1

48.     Once a school has notice of an instance of harassment or an individual harassing other students, the school is obligated to take immediate and effective action to stop and remedy the harassment. If a school receives notice and "the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment. . . ."[34]

49.     Sexually harassing activities from third parties will also trigger a school's obligation to take effective remedying action.[35]

50.     A school can receive "notice" in many different ways, including directly from a student or a student's parent, or indirectly from the media or local community members. A school has a responsibility to investigate and make a "reasonably diligent inquiry" when receiving information about harassment.[36]

51.     In order to facilitate the reporting of incidents of sexual harassment, the school should have a publicized grievance procedure that is tailored to discover sexual harassment as early as possible and that is applied fairly.[37]

52.     Once a school has received notice of harassment, the school is required to take steps to investigate and remedy the harassment regardless of whether a formal complaint has been made.[38]

53.     The 2001 Guidance makes clear that a lack of direct authority over an assailant does not excuse a school from all responsibility:

---

[34] *Id.* at 12.
[35] *Id.*
[36] *Id.* at 13.
[37] *Id.*
[38] *Id.* at 15.

4838-8532-0684.v1

> [S]exually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program. As previously outlined in connection with peer harassment, if the school knows or should know of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence…

> If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits the student's ability to participate in or benefit from the education program. In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.[39]

54.    A number of other DOE documents have made similar points. For instance, an Office for Civil Rights letter to the president of Frostburg State University in Maryland detailing Title IX violations noted that one way in which the "University failed to provide for adequate, reliable, and impartial investigations" was that in several cases, "the University did not proceed with an investigation because the incident occurred off campus or involved a non-student victim or perpetrator," meaning that the school failed to "make a determination regarding whether the conduct occurred in the context of an education program or activity, or had continuing effects on campus, or in an off-campus education program or activity."[40]

55.    Ultimately, the 2001 Dear Colleague Letter established a baseline approach to Title IX implementation that required schools to be proactive in taking a victim-centered approach to Title IX issues.

---

[39] *Id.* at 12-13.
[40] U.S. Dep't of Educ. Office of Civil Rights, <u>Letter to Dr. Ronald Nowacyk</u> (Sept. 9, 2016).

4838-8532-0684.v1

**2008 Dear Colleague Letter**

56.     The 2008 Dear Colleague Letter was written as a supplement to the guidance provided in the 2001 Dear Colleague Letter.[41]

57.     As an initial matter, the 2008 guidance unequivocally notes that sexual violence is a form of sexual harassment prohibited by Title IX. The guidance also expressly notes that "a single instance of rape is sufficiently severe to create a hostile environment."[42]

58.     Noting the prevailing requirement for a school to take immediate action when it knows, or should know, about student-on-student harassment, the 2008 guidance also reinforces the notion that a school must remedy the effects of such harassment even if it took place off campus.[43]

59.     In addition to underscoring the obligations of a school previously outlined in the 2001 guidance, the 2008 Dear Colleague Letter provides concrete direction on what a school must do to comply with Title IX's requirements.  For example, the 2008 guidance expressly notes that a school must have a Title IX coordinator and that the coordinator must not have other duties or responsibilities that might create a conflict of interest. The guidance specifically notes that it would be inappropriate to have a Title IX coordinator who also had disciplinary or legal responsibilities.[44]

60.     The guidance also requires training for school law enforcement personnel, noting that "all school law enforcement unit employees should receive training on the school's grievance procedures and any other procedures used for investigating reports of sexual

---

[41] 2008 Dear Colleague Letter at 2.
[42] *Id.* at 3.
[43] *Id.* at 4.
[44] *Id.* at 7.

violence."[45] Of course, such procedures must necessarily comply with Title IX requirements generally. It is also clear that the training must be done on a recurring and regular basis.[46]

61.     Grievance procedures should not require a victim to work out the issue directly with the alleged perpetrator.  Instead, the procedures should allow the victim to receive prompt and equitable resolution.[47]

62.     With respect to student athletes, the 2008 guidance expressly states:

> These procedures must apply to all students, including athletes.  If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaint must not be addressed solely by the athletics department procedures.[48]

63.     The 2008 Dear Colleague Letter also outlines proactive measures a school should take in order to comply with Title IX.  Such measures include preventative education programs, providing victims resources and services, orientating programs, and training for student athletes and coaches.[49]

64.     With respect to a school's investigative responsibilities, a school must, in the course of investigating an instance of sexual violence, evaluate if other students have been victimized, investigate whether school employees knew or should have known of the misconduct, and initiate with student leaders a "climate check" to assess the effectiveness of the school's efforts in complying with Title IX.[50]

---

[45] *Id.* at 7, 17.
[46] *Id.* at 18.
[47] *Id.* at 8.
[48] *Id.*
[49] *Id.* at 14.
[50] *Id.* at 18.

4838-8532-0684.v1

**Additional Legal Requirements and Private Enforcement Under Title IX**

65. An institution may be liable for civil penalties if it has not upheld its legal obligations under Title IX.

66. Institutions like the U of U, UVU, and the Utah System of Higher Education may be liable for violating Title IX where the institutions act with deliberate indifference to known acts of harassment, discrimination, and/or assault, or has a policy that creates a disparate impact on one gender, among other ways.

### a. Deliberate Indifference

67. "Deliberate indifference to known acts of harassment . . . amounts to an intentional violation of Title IX, capable of supporting a private damages action."[51]

68. This includes harassment both by the institution itself and by other students, as long as "the funding recipient has some control over the alleged harassment."[52]

69. The Tenth Circuit has interpreted Supreme Court precedent to create a four-factor test for liability for deliberate indifference. A plaintiff "must allege that the [institution] (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school."[53]

---

[51] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (citing *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274 (1998).
[52] *Id.* at 644.
[53] *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (citing *Davis*).

4838-8532-0684.v1

70.     Deliberate indifference may be demonstrated by an institution "respond[ing] to known . . . harassment in a manner that is clearly unreasonable."[54]

71.     Whether a response is "clearly unreasonable" is a question of fact and is intended to be flexible.[55]

72.     Nevertheless, where an institution "knowingly refuse[s] to take any action in response to the behavior, such as investigating or putting an end to the harassment, or refuse[s] to take action to bring the recipient institution into compliance," the school has demonstrated deliberate indifference giving rise to liability.[56]

73.     An institution "intentionally subject[s] students to harassment" when it "deliberately decide[s] not to take remedial action."[57]

74.     Severity can also be established by a single incident. "The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe."

75.     For instance, "a single instance of rape is sufficiently severe to create a hostile environment."[58]

---

[54] *Davis,* 526 U.S. at 649.

[55] *Id.*

[56] *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 90 (2d Cir. 2011) (internal punctuation omitted) (quoting *Davis*, 526 U.S. at 651, 654; *Gebser*, 524 U.S. at 290).

[57] *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (emphasis in original) (citing *Davis*, 524 U.S. at 290).

[58] 2011 Dear Colleague Letter at 3 (citing *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999); *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010); *Turner v. Saloon, Ltd.,* 595 F.3d 679, 686 (7th Cir. 2010); *McKinnis v. Crescent Guardian, Inc*., 189 F. App'x 307, 310 (5th Cir. 2006)).

b. **Disparate Impact**

76.     Disparate impact claims are permissible in Title IX litigation and enforcement. The Department of Justice's Title IX legal manual states that a disparate impact violation occurs when "a recipient violates agency regulations by using a neutral procedure or practice that has a disparate impact on protected individuals, and such practice lacks a substantial legitimate justification."[59]

77.     Even if a legitimate justification exists, the recipient must also show that there are no "equally effective alternative practices that would result in less adverse impact."[60]

78.     Courts have found that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent," may be discriminatory if they result in differing outcomes based on gender.[61]

79.     Disparate impact is something for which a plaintiff may seek injunctive relief.

**Plaintiff**

80.     On September 15, 2019, Plaintiff went to a small gathering at the house of a football player at the U of U.

81.     The gathering was attended by students attending various schools within the Utah System of Higher Education.

---

[59]   U.S. Dep't of Justice, Title IX Legal Manual, § IV(A)(2), *available at* https://www.justice.gov/crt/title-ix.

[60]   *Id.* (internal quotation marks removed).

[61]   *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) (interpreting Title VII); *Roberts v. Colo. State Bd. of Agric.*, 997 F.2d 824, 832-33 (10th Cir. 1993) (finding no error in district court's "failing to require proof of discriminatory intent"); *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia*, 877 F.Supp. 634, 674 n.49 (D.D.C. 1994), *vacated in part on other grounds* 899 F.Supp. 659 (D.D.C. 1995) (finding "no requirement of [discriminatory] intent" in Title IX's implementing regulations).

4838-8532-0684.v1

82.     Prior to the gathering, Plaintiff had known this football player through mutual friends.

83.     Despite this player's attempts to communicate romantically with Plaintiff, Plaintiff never responded to his communications and kept the relationship amicable but distant.

84.     At the time of the gathering, the player was a 6'0, 235 lbs. linebacker for the U of U, and Plaintiff was a sophomore student from UVU.

85.     During the gathering, Plaintiff expressed her reluctance to be alone with the player to her friends and asked her friends to keep her away from him.

86.     However, at some point in the night, the player isolated Plaintiff and sexually assaulted her despite Plaintiff's protests and attempts to escape.

87.     After Plaintiff was able to get away from the player, Plaintiff went to the hospital with two friends and completed a rape kit.

88.     Staff from the hospital instructed Plaintiff to report the incident to UVU's Title IX Office to receive support and resources.

89.     Sometime in September 2019, shortly after the sexual assault, Plaintiff went to UVU's Title IX office and reported the sexual assault to Christopher Forbush and Jerrica James from UVU's Title IX Office.

90.     UVU's Title IX Officers told Plaintiff that UVU could not help her because the football player was not their student and was not living on campus.

91.     UVU Title IX Officers told Plaintiff to report the incident to the U of U's Title IX office to "scare" the football player from "*actually* violently raping someone."

92.     UVU's Title IX Office never attempted to contact or follow up with Plaintiff after Plaintiff's initial meeting and did not provide her any resources whatsoever.

93.     Plaintiff next emailed Sherrie Hayashi at the U of U's Title IX Office to set up an appointment with the U of U's Title IX Office.

94.     Ms. Hayashi referred Plaintiff to Erica Wood, another officer from the U of U's Title IX Office, and to schedule an appointment with her, which she did.

95.     On October 3, 2019, Plaintiff went to the U of U's Title IX office and met with Erica Wood from the U of U's Title IX Office.

96.     Plaintiff reported the sexual assault to Ms. Wood.

97.     Ms. Wood first told Plaintiff that, since Plaintiff was not a student, the U of U's obligations were to the football player, not to her.

98.     Ms. Wood also told Plaintiff that, since the incident did not occur on campus, the U of U was limited in the things it could do about the situation.

99.     Plaintiff asked Ms. Wood about the complaint process and Ms. Wood proceeded to take out a pamphlet to explain each step—emphasizing the length of time each step took and the potential of re-traumatization that each step could entail. Plaintiff felt as though Ms. Wood was attempting to dissuade her from filing a complaint.

100.    Ms. Wood then explained to Plaintiff about their alternate resolution program, telling Plaintiff that she found most victims found this to be the most "healing."

101.    Ms. Wood explained that the alternate resolution program usually entailed victims writing notes to their aggressors letting the aggressor know how they made the victim feel.

102.     The Title IX Office would then interview the aggressor and allow the parties to come to an alternate resolution.

103.     The suggested alternative resolutions involved the aggressor receiving more education so the aggressor can make better decisions in the future and/or the aggressor working more with his coaches to ensure he made better decisions in the future.

104.     Plaintiff asked whether the football player would face any serious repercussions for his actions such as being kicked off the football team or suspended from school, and Ms. Wood explained that Plaintiff could ask for those conditions; however, Ms. Wood stated that the decision would be made by the coaches and the player would have to agree to the conditions.

105.     Ms. Wood then reiterated to Plaintiff that there was not much the U of U and its Title IX Office could do for Plaintiff and that Plaintiff could seek help from the Rape Recovery Center.

106.     Plaintiff asked whether the police would be involved in the investigation, and Ms. Wood said that the police would not be involved. Ms. Wood stated that sometimes the U of U's Campus Police were involved.

107.     Ms. Wood also discouraged Plaintiff from reporting the sexual assault to the police given that often times, unless the aggressor confesses, there was little chance of the aggressor being charged, prosecuted, and convicted of the crime.

108.     Plaintiff left the U of U feeling confused and more hurt.

109.     After the meeting, Ms. Wood emailed Plaintiff a list of resources "that as a non-U student… may not apply to you."

110.   On October 15, 2019, Ms. Wood sent Plaintiff an email following up on their initial meeting on October 3, 2019.

111.   In this email, Ms. Wood stated that, even if Plaintiff filed a complaint with the U of U and named her aggressor, the U of U "may be limited in [its] ability to address [Plaintiff's] complaint" because Plaintiff was not a student of the U of U.

112.   Ms. Wood also reiterated in her email that Plaintiff could seek resources from UVU and/or the Rape Recovery Center.

113.   On December 2, 2019, Plaintiff reported the sexual assault to the Unified Police Department.

114.   Detective Sheperd went to the U of U to interview football coaches and administrators.

115.   The football player still went on to play in a bowl game shortly after.

116.   On February 6, 2020, Ms. Wood from the U of U's Title IX Office sent Plaintiff another email after another football player at the U of U had been accused of sexual assault and it was in the local news.

117.   In this email, Ms. Wood asked if this other football player was involved in Plaintiff's incident and if there were any "similarities or connections between [her] experience and what has been reported in the news even if it was a different perpetrator[.]"

118.   Plaintiff felt as though Ms. Wood only reached out to her because of the news stories and the Unified Police Department's involvement, despite Ms. Wood previously telling Plaintiff that the U of U did not involve the police in their complaints.

4838-8532-0684.v1

119.    Plaintiff provided Ms. Wood Detective Sheperd's contact information and asked Detective Sheperd to share all of her information with Ms. Wood.

120.    The U of U has not followed up with Plaintiff since then and has not provided any resources to Plaintiff.

121.    The football player was suspended from the football team right before Spring Ball when he allegedly showed up to practice under the influence of alcohol.

122.    Since the sexual assault, Plaintiff has struggled with depression and other severe mental health issues.

## FIRST CAUSE OF ACTION

### Deliberate Indifference Under Title IX Against All Defendants

123.    Plaintiff incorporates and realleges the preceding allegations as if sully set forth herein.

124.    As set forth above, UVU had actual knowledge of Plaintiff's rape since September 2019 when Plaintiff reported her rape to two employees of UVU's Title IX Office.

125.    The U of U had actual knowledge of Plaintiff's rape since October 3, 2019 when Plaintiff reported the assault to the U of U's Title IX Office.

126.    The Board, given its authority over, coordination amongst, and collection of data from member institutions and their Title IX offices, had notice of Plaintiff's assault.

127.    All Defendants responded to Plaintiff's rape by refusing to investigate the matter or to provide any assistance.

128.    More egregiously, the U of U told Plaintiff that their obligation was to the football player, not her, and that her best option (without knowing all of the circumstances of Plaintiff's

24

incident, only that it involved a football player from the U of U) was to go through their alternative dispute program. Further, the U of U dissuaded Plaintiff from reporting the assault to the police.

129.    UVU made no effort to assist Plaintiff in the aftermath of her rape or to provide resources for her in the future, despite clear guidance from the Department of Education regarding a school's duty to understand the effects of sexual violence and the potential for revictimization.[62]

130.    Despite this knowledge, UVU did not take steps to protect or assist Plaintiff in the aftermath of her sexual assault.

131.    The U of U allowed the football player to remain an active student athlete without any further investigation.

132.    Defendants' responses subjected Plaintiff to harassment and created a hostile environment for her.

133.    Defendants' responses, despite authority to coordinate amongst themselves and with the Board, not only failed Plaintiff but left other students at extreme risk to be sexually assaulted by the same individual, as no investigation was conducted.

134.    Defendants' responses to Plaintiff's rape were clearly unreasonable and constituted deliberate indifference to Plaintiff's rape.

135.    Defendants' deliberate indifference deprived Plaintiff of USHE's educational benefits and opportunities by forcing her to suffer trauma alone.

---

[62] *See, e.g.*, 2014 Guidance at 38-39.

136.    Plaintiff has been denied access to education benefits to USHE institutions as a whole. She can no longer attend events or utilize facilities (such as the library, stadium, campus buildings) at the U of U due to her suffered trauma from the rape, fear of running into this student again, and fear of revictimization.

137.    Plaintiff's grades and academic performance at UVU have suffered dramatically, and she was not offered any supportive measures to help her cope.

138.    Defendants have thus demonstrated deliberate indifference to the sexual harassment and assault of Plaintiff.

139.    Plaintiff suffered damages as a result of Defendants' deliberate indifference, including but not limited to mental and emotional distress, medical expenses, and lost educational opportunities.

## SECOND CAUSE OF ACTION

### Disparate Impact Under Title IX Against All Defendants

140.    Plaintiff incorporates and realleges the allegations of each of the preceding paragraphs as if fully set forth herein.

141.    Defendants do not coordinate Title IX investigations amongst member schools of USHE, despite the clear authority and ability to do so.

142.    Defendants UVU and the U of U have policies to not provide accommodations for a rape victim, or investigate a student accused of rape, if both the accuser and accused attend different schools, even if the schools are both members of USHE.

143.    As women are statistically at far greater risk for sexual violence than men, such policies have an immense disparate impact on women at member schools of USHE.

4838-8532-0684.v1

144.    Defendants' noted policies lack a substantial justification, as coordination among member schools is not only possible, but member schools already coordinate for a breadth of reasons, including student safety. There is no reason why USHE schools cannot accommodate for and investigate students involved in sexual violence.

145.    Plaintiff has suffered damages as a result of the disparate impact of Defendants' policies.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgement against Defendants as follows:

1.    For judgment in Plaintiff's favor and against Defendants' deliberate indifference and unequal impact as prohibited by Title IX;

2.    For judgment in Plaintiff's favor and against Defendants University of Utah, Utah Valley University, and the Utah System of Higher Education (the Board);

3.    For an award of compensatory damages in favor of Plaintiff and against Defendants, including damages resulting from emotional distress, in an amount to be determined at trial;

4.    For an award of special damages in favor of Plaintiff and against Defendants for expenses arising out of their violations of Title IX, including but not limited to medical and therapy expenses, and the cost of tuition and other school fees paid by Plaintiff during semesters in which their actions denied Plaintiff the benefits of the school's education programs;

5.    For injunctive relief, pursuant to the Title IX disparate impact theory, in the form of Defendants coordinating Title IX investigations amongst USHE member schools,

investigating member students accused of sexual violence, and providing accommodations for member students alleging sexual violence against them;

6. For an award of reasonable attorneys' fees and costs associated with this action;

7. For an award of post-judgment interest as allowed by law;

8. For such other and further relief as the Court may deem just.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action.

DATED December 21, 2021.

        */s/ Michael W. Young*
        Michael W. Young
        Lauren M. Hunt
        PARSONS BEHLE & LATIMER

        Attorneys for Plaintiff